205 N.J. Super. 87 (1985)
500 A.2d 49
THE ALLAN-DEANE CORPORATION, PLAINTIFF,
v.
TOWNSHIP OF BEDMINSTER AND TOWNSHIP OF BEDMINSTER PLANNING BOARD, DEFENDANTS.
LYNN CIESWICK, APRIL DIGGS, W. MILTON KENT, GERALD ROBERTSON, JOSEPHINE ROBERTSON, AND JAMES RONE, PLAINTIFFS,
v.
TOWNSHIP OF BEDMINSTER AND TOWNSHIP OF BEDMINSTER PLANNING BOARD, DEFENDANTS.
Superior Court of New Jersey, Law Division Somerset/Ocean Counties.
Decided May 1, 1985.
*102 Henry A. Hill, Jr. for plaintiff The Allan-Deane Corporation (Brener, Wallack & Hill, attorneys).
*103 Kenneth E. Meiser, for plaintiffs Lynn Cieswick, April Diggs, W. Milton Kent, Gerald Robertson, Josephine Robertson and James Rone (Department of Public Advocate, attorneys).
Alfred L. Ferguson, for defendant Township of Bedminster (McCarter and English, attorneys).
Roger W. Thomas, for defendant Township of Bedminster Planning Board (Dolan and Dolan, attorneys).
SERPENTELLI, A.J.S.C.

I. Background and Statement of Issue

Another segment of Bleak House Revisited is before the court. This granddaddy of all Mount Laurel litigation  now a teenager, is here for a review of a proposed township compliance ordinance. It is time to write what I hope will be the final chapter in this saga. By this decision the court approves the proposed ordinance and grants the township a six year judgment of repose.
The issue before the court is whether the township has adopted a zoning ordinance which provides a realistic opportunity for the actual construction of its fair share of low and moderate income housing and has satisfied any builder's remedies which have been earned. Southern Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 92 N.J. 158, 220-222 (1983) (hereinafter Mount Laurel II) (All page citations shall refer to Mount Laurel II unless otherwise noted.) Before addressing that issue, a brief history of this case is appropriate.
The Allan-Deane Corporation (hereinafter Allan-Deane) filed the initial complaint on August 23, 1971 alleging that the Township of Bedminster zoning ordinance was exclusionary. Thereafter, on June 1, 1972 Lynn Cieswick and others filed a similar complaint alleging that they were also disadvantaged by the township's land use regulations. These two actions were subsequently consolidated for trial. A decision was rendered on February 24, 1975 invalidating the Bedminster ordinance. On January 21, 1977 the Appellate Division affirmed the trial *104 court's decision. The township's petition for certification was denied on May 3, 1977. The Allan-Deane Corp. v. Bedminster Tp., 74 N.J. 272 (1977) The township thereafter adopted a new zoning ordinance which was again challenged and again invalidated by the trial court on December 13, 1979. On January 29, 1980 the trial court directed the township to rezone and on March 6, 1980 appointed a master to assist in the process. The court also declared that Allan-Deane was entitled to corporate relief. The township did not appeal from the second finding of invalidity. Instead, it proceeded to rezone in accordance with the court's decision. On March 20, 1981 an order was entered by the trial court declaring that the revised ordinance complied with the constitutional requirements of Southern Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151 (1975) and Oakwood at Madison, Inc. v. Madison Tp., 72 N.J. 481 (1977) The Public Advocate alone appealed, asserting that the revised ordinance must include a mandatory lower income housing component and that Allan-Deane must provide 20% low and moderate income housing in its development as a condition of corporate relief.
On or about November 5, 1980, prior to the trial court's entry of final judgment, another complaint was filed against the township by Leonard Dobbs (hereinafter Dobbs) seeking an order permitting him to build a regional shopping center. In that complaint Dobbs did not offer to provide low and moderate income housing or even mention the subject. The Dobbs action was not consolidated with the suit brought by the Public Advocate.
The appeal filed by the Public Advocate was held in abeyance awaiting a decision by the Supreme Court in the Mount Laurel II proceedings which were then pending. After Mount Laurel II was decided, the Appellate Division on August 2, 1983 remanded the case to this court for further proceedings consistent with the Mount Laurel II decision.
*105 Thereafter the court, the master, all parties and Dobbs engaged in extensive informal case management conferences and other negotiations in an effort to bring about a compliant ordinance (which is commonly referred to in Mount Laurel litigation as a "compliance package"). The effort at resolution continued through the balance of 1983 and into the spring of 1984. In many instances it appeared that the parties were close to agreement only to have additional difficulties develop. Ultimately, the court saw the need to bring about a final disposition of the case either by settlement or by trial. Therefore, on May 25, 1984 while hearing motions brought by Dobbs and Timber Properties, Inc. (hereinafter Timber) to formally intervene, the court denied those motions without prejudice but directed that if the parties did not settle within a period of 30 days, it would reconsider the motions. The parties did go forward with settlement discussions and the court granted an extension of the 30 day limitation. Eventually, the parties resolved their differences though not to the satisfaction of Dobbs and Timber.
The court then held a compliance hearing to determine whether the ordinance met Mount Laurel II standards. A 17 day trial ensued during which the Public Advocate, The Hills Development Company (the successor to The Allan-Deane Corporation, hereinafter Hills) and the township sought to demonstrate the validity of the land use regulations. Dobbs actively sought to demonstrate their invalidity. Timber appeared at the trial but did not present any witnesses.

II. Fair Share

The threshold step in determining ordinance compliance requires calculation of the municipality's fair share. All of the parties to this litigation as well as Dobbs and Timber agreed that the fair share, calculated in accordance with the methodology heretofore adopted by this court in AMG Realty Co. et al. v. Warren Tp., ___ N.J. Super. ___ (Law Div. 1984) (hereinafter AMG) is 819 low and moderate units. Neither Dobbs nor Timber introduced any evidence seeking to modify that number. *106 The township agreed to accept the number and contended that it had zoned for compliance with it. However, it sought to have the court reduce the number based upon its voluntary compliance with Mount Laurel II or alternatively to phase the 819 units by requiring that only 656 units be built by the end of this decade and that the balance be built thereafter.
With respect to the claim for reduction due to voluntary settlement, the township points out that this court has permitted a modification in the fair share numbers of many municipalities which were initially calculated utilizing the AMG methodology. It has, in fact, been the policy of this court to permit adjustments of the fair share number produced by the AMG methodology in those cases in which a municipality has voluntarily stipulated noncompliance and fair share at an early stage of the litigation and has agreed to become compliant within a specified period. Similar adjustments have been permitted in other cases where equity dictated that approach. Furthermore, this modification of the fair share has been granted to municipalities which sought declaratory type relief concerning the compliance of their ordinance even before litigation was instituted against them. Cf. J.W. Field Company, Inc. v. Franklin Tp., 204 N.J. Super. 445 (Law Div. 1985)
There are several justifications underlying the policy of fair share flexibility in cases of voluntary compliance. In the first place, this court has recognized on several occasions that the AMG methodology is not scientifically precise and represents the initial stage of an evolution of a fair share methodology. While the fair share numbers produced by the methodology are generally sound it would be difficult to argue that there is no margin of error in either direction. Second, if the court cannot be flexible in assigning a fair share number there is little incentive for a municipality to resolve its litigation. If the number produced by the methodology is perceived as "the worst we can do", the municipality has little to lose and perhaps something to gain by continuing to fight. Third, to the extent *107 that voluntary compliance results from the court's willingness to make adjustments to the fair share number, it is likely that a greater amount of the existing need for lower income housing will be met sooner. That is, to the extent that by protracted litigation we delay the day when we build what can be built within the projection period, even less of the need will be met. The policy adopted by the court has been attractive to many municipalities. At this writing, approximately a dozen towns have chosen to settle their litigation within a few months of being sued and three others have sought declaratory relief without suit being brought against them.
The township seeks to take advantage of this policy to reduce its fair share. The question is whether it would be appropriate to apply the policy to Bedminster given the history of this litigation. In the first place, the circumstances which allow for fair share flexibility and the goals that such a policy may achieve do not exist in this case. The settlement did not materialize for a period of over a year following the remand by the Appellate Division and almost eighteen months after the Mount Laurel II decision. More importantly, the settlement did not come about until this court on May 25, 1984 directed that either a settlement take place within 30 days or that the two additional plaintiffs might be intervened and trial would be held concerning their right to a builder's remedy. Thus, while it cannot be denied that the parties ultimately managed to resolve this case, the settlement was "voluntary" only in the sense that it did not result from a court imposed judgment. For these reasons, I conclude that there should be no reduction in the fair share number of 819.
With respect to the phasing of the fair share so that only a portion of it must be built in this decade, the court reaches a different result. All parties agreed that it is within the power of the trial court to cushion the impact of Mount Laurel development on municipalities where that impact would cause sudden and radical transformation. (at 280, 219)
*108 The Public Advocate, in support of Bedminster's contention that a radical transformation will occur, emphasizes the following facts:
1. That Bedminster had 938 housing units in 1980 and a population of 2,469 people. (Those figures have not substantially changed to the date of this trial.)
2. That if Bedminster's fair share is reduced by 20% to 656 units, the township would experience a growth of nearly 3,300 units if the lower income units are constructed on the basis of four market units to one lower income unit. Assuming an average of 2.25 persons per household approximately 7,400 additional people would move to the township by 1990.
3. This growth would constitute an approximate 350% increase for Bedminster in housing and a population increase of approximately 300% since 1980.
4. If Bedminster's fair share of 819 units were not reduced by 20%, construction based upon four market units to one lower income unit would result in approximately 4,000 housing units and approximately 9,000 new residents. That would result in an approximate increase of over 430% in housing units and over 370% in population since 1980.
5. For the period of 1960 to 1970 only two out of 126 New Jersey municipalities with a population between 1,000 and 3,000 had a population growth in excess of 200%.
6. From 1970 to 1980 only three out of 97 municipalities with a population of 1,000 to 3,000 increased by more than 200%.
Both the master and the township's expert present similar arguments in support of a finding of radical transformation. Dobbs counters with the following contentions:
1. The Supreme Court has cautioned that the use of the radical transformation doctrine to obtain a phasing of the fair share obligation be used sparingly. (at 219)
*109 2. Radical transformation cannot be measured simplistically by the application of percentages which are based on a municipality's existing population base or past exclusionary practices.
3. A radical transformation argument is inapposite where a municipality has not reasonably attempted to accommodate growth in the past.
4. A radical transformation argument is inapposite where a municipality and the region within which it is located have heretofore accepted and reaped the benefits of commercial ratables and related growth which in and of themselves evidence a radical transformation.
5. A radical transformation argument is inapposite where a municipality has failed to avail itself of zoning alternatives which would mitigate the impact of growth. That is, Bedminster has chosen to satisfy its obligation principally through zoning for construction of homes on a ratio of four market units to one lower income unit and has not sought out alternative modes of compliance.
6. The manner in which the township has concentrated its Mount Laurel compliance sites, within a confined area, magnifies the impact of growth upon the municipality.
With respect to arguments which emphasize percentages of growth, the court agrees with Dobbs that numbers alone cannot justify a finding of radical transformation. It must be acknowledged that many of the communities involved in Mount Laurel litigation are sparsely developed. Fair share compliance programs which use a mandatory set-aside approach of four market units to one lower income unit will necessarily produce high growth percentages. Thus, there is an inevitable tension created between existing growth patterns and the growth to be anticipated from a builder's remedy, which up to now has been the principal means of Mount Laurel compliance. Furthermore, growth rate comparisons without accompanying specific information concerning the actual impact on the communities involved have limited value. Nonetheless, while these *110 deficiencies are apparent, the statistics do provide some broad guidance in assessing the projected growth rates. The Supreme Court demonstrated its concern for the quantity of construction which could occur within a short time. (at 219) Thus the numbers can play some role in the court's determination. For example, the fact that of all towns in New Jersey with a population of 1,000 to 3,000 only two towns grew by more than 200% in the 1960's and only 3 towns grew by more than 200% in the 1970's, must have some relevance.
The arguments made by Dobbs deserve brief individual attention. Certainly the Court has emphasized that the power to phase because of radical transformation should be exercised sparingly and with special care so as not to significantly dilute the Mount Laurel obligation. (at 219) However, the question remains whether phasing is appropriate in this case. The contention that the municipality should not be able to assert a radical transformation defense where it has not reasonably attempted to accommodate growth in the past renders an argument for phasing practically impossible in most municipalities given the fact that most ordinances have been exclusionary. The same is true with respect to the argument made by Dobbs that a municipality may not accept the benefits of commercial ratables and related growth and at the same time assert a defense of radical transformation. Apparently Dobbs would have those municipalities punished for their past sins rather than have them rectified in an orderly fashion in the future. The argument that the growth of ratables or the development of highways in and of itself constitutes a radical transformation is misplaced. It may or may not have created a radical transformation in a general sense but it is certainly not the radical transformation to which the Court was referring when it made provision for phasing because of the pace of Mount Laurel construction.
There is some appeal to the argument that the radical transformation is magnified by Bedminster's means of compliance because it has chosen to satisfy most of its fair share by the *111 construction of four market units for each lower income unit. However, the argument does not carry great weight. First, the township is faced with the presence of a plaintiff who has a right to a builder's remedy for approximately one-third of the total fair share of the town. Second, the township has made a planning decision to locate its Mount Laurel compliance parcels in proximity to the builder's remedy parcel. Its options with respect to the adjacent parcels are somewhat limited. Third, the township might be hard pressed to demonstrate, under the circumstances of this case, that it can provide alternative modes of compliance which would meet the court's requirement that it do so within a reasonable time span. Fourth, it must be acknowledged that what constitutes compliance is still an open issue. Bedminster had to make a judgment call with respect to what would be acceptable to this court. Certainly it could not be suggested that it has purposely punished itself by increasing the quantity of units to be constructed just so that it might claim a radical transformation. I hasten to add that while this argument does not carry the day at this point in the history of Mount Laurel litigation, it may have considerable weight in the future as acceptable and realistic alternative modes of compliance are developed.
Mount Laurel II does not provide a definition of radical transformation. The common sense connotation is a rapid and extreme change in existing conditions. The court must measure the capacity of the municipality to absorb that change within a specified planning period. Implicated in that evaluation will be the extent of required capital improvements such as water, sewer and roads. Institutional and service demands such as schools, police and fire protection and municipal government facilities must also be examined. Of course, this capacity measurement must also account for any unique environmental or planning conditions which might render a town particularly sensitive to sudden growth.
The court has heard testimony with respect to the rural character of Bedminster. Evidence reveals that its infrastructure *112 is extremely limited and that its road system is compatible with its rural character. Its school system is structured to its size. The township's expert testified that the existing school will have to be expanded to accommodate the Hills development alone and that another school will be required when the other sites have been constructed. There are few full time municipal employees and the municipality's physical facilities are very limited. In short, Bedminster is essentially a rural community which has not changed significantly in character for many years. I find no difficulty in concluding that the fulfillment of the full fair share of 819 in this decade would bring about a radical transformation in the township. A strong argument could be made that the fulfillment of an obligation of 656 lower income units in the manner provided for in the Bedminster compliance package might also constitute a radical transformation. However, that issue need not be reached since the township has stipulated that it can accept that number.
Based on these facts the court finds that the fair share of the township is 819 units for the decade of 1980 to 1990. That fair share will be met by the provision of 656 of those units on or before December 31, 1990, which is actually one year into the next decade but is also roughly coincident with the six year period of repose. The balance of 163 units shall be provided on or before December 31, 1994. In both cases the number shall be evenly divided between low and moderate income households. It should be stressed, however, that the 163 units are a deferred portion of the 1980-1990 obligation and shall be in addition to any fair share obligation which Bedminster is found to have for the decade of 1990-2000.

III. Compliance of Bedminster Ordinance

A. The Test of Compliance

Having determined that the fair share of the township is 819 lower income units, I now turn to the issue of whether it has *113 amended its zoning ordinance to provide the realistic opportunity for the construction of its fair share. Before analyzing the Bedminster compliance regulations the court must first clarify the framework within which the municipal ordinances are to be judged. In short, what is the test of compliance?
Our Court has clearly expressed the obligation. A municipality must provide a realistic opportunity for the construction of its fair share. "Realistic" is defined by the Court in terms of "likelihood". (at 221-222) What proofs will support the conclusion that the municipal action has achieved the required likelihood? To answer this ultimate question the court will perform the following inquiry:
1. Verify that the ordinances are free from all excessive restrictions and exactions or other cost generating devices that are not necessary to protect health and safety.
Our Court has established this as a minimum step towards compliance. (at 258-259)
2. Examine the sites selected or other mechanisms used by the town to achieve compliance.
In this examination, the court will assess whether those sites or mechanisms provide a realistic opportunity (i.e. likelihood) for the actual construction of lower income units within the compliance period. This assessment may include evaluation of site suitability, use of affirmative measures to encourage lower cost housing, alternative compliance mechanisms, project feasibility, and any intangible factors which may have a very real influence upon the development of lower income housing. Furthermore, the court must ensure that any sites which have earned entitlement to a builder's remedy have been designated for rezoning.
3. If the sites selected or other mechanisms employed are realistic, then the compliance package should be approved.
As long as the court is satisfied that the compliance package is realistic, it will enter a judgment of compliance. The court should not look to any sites not selected or mechanisms not employed even if they might arguably be as realistic *114 or more realistic unless an excluded site has earned a builder's remedy. Absent a builder's remedy, a municipality should have the right under Mount Laurel to choose any reasonable combination of realistic sites or realistic mechanisms that will produce the required result  the likelihood. It should not be forced to decide which course is most realistic and then be forced to select that course. In many cases, neither the court nor the parties will be able to determine with any certainty which sites or mechanisms may be more or less likely. Even in those cases where it would be possible, a gradation of likeliness should not be an element of the evaluation. Rather, the court should focus upon the compliance package that the township presents by examining each of its parts and its overall effect to determine whether the package is realistic.
This standard of compliance should make it possible to achieve all the purposes underlying the Mount Laurel doctrine while at the same time preserve the legitimate planning control which the Court sought to protect for our municipalities. (at 214) Rejecting a weighing of likeliness between included and excluded sites should simplify the compliance procedure and hearings. Finally, to those who may be excluded in the process, the test is not unfair. There is no inherent right to Mount Laurel zoning absent a builder's remedy. The Mount Laurel principles exist for the benefit of the lower income households of our State, not for those seeking rezoning. A plaintiff receives Mount Laurel zoning by earning it  that is, bringing about Mount Laurel compliance by demonstrating that the ordinance is exclusionary and offering to build a substantial amount of lower income housing. (at 279-280) A builder or property owner not so entitled should not be heard to upset an otherwise acceptable municipal plan simply because it does not include a site upon which lower income housing is also likely. That demands more of our towns than the Mount Laurel principles dictate. It also represents an unwarranted intrusion into the well established prerogatives of our municipalities.
*115 Certain aspects of this test of compliance require brief comment before the court examines the Bedminster efforts at meeting the test. As noted above, the second step in the evaluation process involves an examination of the sites selected or other mechanisms used by the township to achieve compliance. The assessment may include, among other things, site suitability, affirmative measures, alternative compliance mechanisms, project feasibility and other less tangible factors.
A review of site suitability relates to the physical appropriateness of the parcel. Such factors as environmental suitability, availability of infrastructure, proximity to goods and services, regional accessibility and compatibility with neighboring land uses may impact upon whether the court finds a parcel suitable for Mount Laurel development.
A review of affirmative measures relates to the matters discussed in Mount Laurel II at 260-274, including subsidies, inclusionary zoning devices, incentive zoning, mandatory set-asides and the resale controls necessary to ensure that the lower income unit will remain affordable over the long term.
A review of alternative compliance mechanisms relates to any approaches that a municipality may propose as means of avoiding the construction of four market units for each lower income unit which results from use of a 20% mandatory set-aside. Examples might include commercial incentive zoning which produces lower income housing or projects fully funded by the municipality. The court will be called upon to gauge whether the alternative mechanisms will be likely to lead to Mount Laurel housing.
A review of project feasibility relates to whether the rezoning and other affirmative measures will provide a builder with a sufficient profit to make the project a likelihood. (at 279, n. 37) If the project is not economically feasible, a builder will not undertake construction and Mount Laurel housing will not materialize. In reviewing project feasibility, the court will address any density bonus granted to the builder in light of the *116 required set-aside to determine if it provides sufficient funds to internally subsidize the lower income units. If the bonus is too low or the set-aside too high, lower income housing will not result. In that regard the court should also address fee waivers, tax abatements and other municipal actions designed to provide the developer with the assurance of a reasonable profit.
The last element of review is related to what has been described above as intangible factors. The mere revision of a zoning ordinance to provide Mount Laurel zoning does not guarantee that lower income housing will actually result. Absent a builder's remedy, the only change is the creation of the realistic opportunity for such housing. Within reason, the court should try to discern whether there are any hidden barriers in the compliance package which would impair the Mount Laurel climate that the rezoning or other mechanisms attempts to create. The individual predilections of property owners, possible political pressures on them not to sell, title problems in the selected site, vested approvals for other uses, the inflation of market prices caused by rezoning and other such factors are areas of relevant inquiry. (cf. 261, n. 26) Of course, because of the inherent vagaries involved in this exercise the court must, on a case by case basis, place a limit on just how far it will pursue such issues. Hard proof of such problems cannot be ignored. Speculation, on the other hand, could be endless. The court must use its discretion to control the evidence in relation to its value. For example, there could be instances in which the present intentions of the property owners concerning sale are in dispute. In those situations perhaps the most the court can do is consider what a rational owner would do under the circumstances.
Finally, before examining Bedminster's ordinance, one other aspect of the compliance test warrants brief attention. While a municipality should be given as broad a rein as possible in designing its response, the court will not assume that merely because each site selected is itself realistic the combination of those sites into a compliance package automatically produces an *117 acceptable ordinance. Thus, for example, the court will have to address itself to possible social segregation within each project and within the town as a whole. (cf. 268, n. 32) Not only must each site be realistic, the total package must represent reasonable planning.

B. The Bedminster Compliance Package

With regard to certain portions of the compliance test, there is no dispute that Bedminster has passed. Everyone in this matter agrees that the ordinance is now free of excessive restrictions and exactions or unnecessary cost generating devices.
As to affirmative measures, the principal device utilized by Bedminster is mandatory set-asides. All but one of the parcels rezoned for compliance purposes require the builder to sell or rent units below their fair market value so that they may be affordable to lower income people. The builder in return receives a density bonus. As to one parcel, the township created a different affirmative device whereby in exchange for the dedication of a parcel of land to the township which would be devoted to lower income housing, the builder is permitted to construct a commercial facility at a greater square footage ratio to land than he would have otherwise been allowed if no dedication were made. In addition, the municipality has provided for a small amount of overzoning which will be discussed subsequently.
The township has taken certain other affirmative steps to ensure the actual construction of lower income housing. The court notes, however, that the township's contribution through the affirmative devices mentioned below shall not be deemed a prototype for future cases or even for other projects in Bedminster. The steps taken to date include:
1. The waiver of certain fees for subdivisions, site plans, building permits, certificates of occupancy and engineering reviews.
2. The township adopted a resolution of need and a tax abatement agreement concerning the existing low and moderate construction on the site where Hills is presently constructing 260 lower income units.

*118 3. Bedminster assisted Hills in obtaining financing for that development through the New Jersey Mortgage Finance Agency.
4. The township entered into a consent order on May 25, 1984 whereby it agreed, under certain circumstances, to make reasonable contributions to the administrative expenses of the nonprofit corporation which is to monitor sales of the lower income units and maintenance of their price structure as lower income units.
5. The township entered into an agreement with the Environmental Disposal Corporation (hereinafter EDC) and Hills to pursue the expansion of the sewer franchise area and sewer plant of EDC to provide sewage capacity to most of the Mount Laurel sites.
6. The township has agreed with the Public Advocate that in the event its compliance package is approved by the court it will immediately take all reasonable steps necessary to upgrade its municipally owned sewage treatment facility, known as the Bedminster-Far Hills plant (hereinafter BFH). The township has also agreed with Timber, one of the owners of a compliance site, to reserve capacity in the BFH plant for a ten acre senior citizen lower income housing site to be dedicated by Timber to the township.
Since the mandatory set-aside approach is the predominant manner of satisfying the Mount Laurel obligation in Bedminster, the court must undertake a detailed review of the sites selected to determine whether they provide the realistic opportunity for the construction of lower income housing in the time period required by the court. There is annexed to this opinion as Appendix I a map which designates the sites selected by the township for Mount Laurel compliance as well as certain other sites to which the court will refer. Sites A through K are the compliance sites. There is also annexed to this opinion as Appendix II a recapitulation of the number of lower income units expected to result from the utilization of those sites as reflected by the opinion of each of the experts who testified.

1. Sites A through E

As noted from Appendix II, there is no dispute with respect to the number of units which are likely to result from sites A through E. All of the experts agree that these sites will produce 629 units of lower income housing and that the housing will result by the end of 1990. In fact, site A which is owned by Hills, is already under construction. All 260 units are *119 either sold or in some stage of construction. Site B which is also owned by Hills is scheduled to start construction shortly. It will produce 180 lower income units. Both sites have sewerage presently available through EDC which is corporately related to Hills. There are no significant restraints which would preclude the development of either site although in the planning of site B, Hills must make adjustments for some steep slope conditions. No one has suggested that these adjustments cannot be made. Sites C, D and E are within the franchise area of EDC although there is no present legal requirement to sewer those properties. The issue of sewerage will be addressed after the site review is completed.
Dobbs' expert verified the propriety of including sites A to E in the compliance package. When asked whether it was appropriate to include those sites, he responded that if he were recommending a compliance package to the court he would include those five sites and expect them to produce the anticipated 629 units by 1990. It should also be noted that the township's expert witness contacted the owner of sites C and D and the owner of site E and verified their willingness to sell their properties.

2. Site F  Washington Court

This parcel consists of six individual lots plus a small cul-de-sac and is commonly referred to as Washington Court. Two of the lots are vacant and the remaining four have existing single family detached dwellings. In aggregate, the parcel consists of approximately 32 acres excluding the cul-de-sac. It is currently zoned for a planned unit development at a density of ten units per acre with a 20% mandatory set-aside. It is located within the franchise area of EDC and as can be seen by reference to Appendix I, it is immediately adjacent to parcel B which is the next site to be developed by Hills. One person owns three of the lots in site F. On one five acre lot that individual has a home. The second lot is vacant and is approximately 11 acres. The third lot is also vacant and is approximately *120 five and one-half acres. Adjacent to the five and one-half acre lot is a two acre lot already owned by Hills. Although the Hills property has a structure upon it, the aggregation of the Hills lot with the two vacant lots would provide an 18 1/2 acre site for development. The township expert testified that the 11 acre lot is already for sale and that the common owner of the five and one-half acre lot who also owns a home within site F would be willing to consider the sale of the home site and the additional vacant lot. The Hills site and the three lots in common ownership would produce a 23 1/2 acre site with a ten unit per acre zoning and a 20% mandatory set-aside.
The court appointed master and the township expert both contended that site F would generate 51 lower income units. Dobbs' expert disagreed placing this site in what he characterized as "a never-never land" principally because of the difficulty of assemblying lots not in common ownership. The Public Advocate's expert stated that while assemblage and the existence of dwellings on certain properties within site F created the probability that the total site was less likely to be developed within the compliance period, at least 31 lower income units would result from those lots which were in common ownership.
In the court's view the position taken by the Public Advocate is the most reasonable. There is no denying that the assemblage of sites as well as the existence of dwellings within the parcel constitute a significant constraint upon the immediate use of site F. However, there are several factors which lead the court to conclude that there is a reasonable likelihood that this site will be available even though it might come to the market at a later date than other sites in the compliance package. Included among those factors are the common ownership of three sites by one property owner, the ownership of one site by Hills which is immediately adjacent to two sizeable vacant sites, the proximity of site F to the franchise area of EDC, the proximity of it to the site which is already under development and parcel B which will be developed next and the intensity of the housing demand existing in the area.

*121 3. Site G  AT & T

Site G consists of approximately 52 acres and is directly across the road from site B, the next Hills site to be constructed. It is presently owned by American Telephone and Telegraph (AT & T) which operates a facility to the north which is physically separated from parcel G by Interstate 287. The court appointed master and the experts on behalf of the township and the Public Advocate all agreed that this site is likely to produce 90 lower income units. There is some difference of opinion as to when the units would be built. Dobbs' expert pointed to access and sewer availability as major constraints to the development of this site along with the fact that it is heavily wooded. In addition he stressed that the access road would have to be expanded and utilities brought to the site. However, the principal constraint seems to be sewerage.
Parcel G is not within the franchise area of EDC and therefore there would be some delay even if the franchise area is expanded. However, the township and EDC have executed a contract whereby EDC agrees to make application for expansion to include site G in its franchise area if AT & T enters into an agreement with EDC to pay a proportionate share of the expansion of the EDC plant. Testimony supported the proposition that once the Department of Environmental Protection approved the expansion of the EDC plant, the Board of Public Utilities could approve the petition to expand the franchise area within two months. With regard to road access, it is the township's position that because Hills will start constructing homes on site B as it completes site A, it will be necessary to provide access to site B through the very same road which will service site G. Therefore, the inclusion of site G within the compliance package is particularly logical from an economy of scale viewpoint.
The township concedes that the parcel in question has topographical constraints. However, it points out that in computing *122 the number of units to be credited for lower income purposes it has allowed for such constraints. Dobbs' expert could not deny that the parcel could be developed if the constraints were adequately addressed in the site development plans.
The court finds that site G is an appropriate parcel for inclusion in the compliance package. The agreement to expand the EDC franchise area and the treatment plant's capacity, the likely improvement of Schley Mountain Road in order to provide access to site B and thereby also access to site G, the proximity of the site to parcel B which is the next to be developed by Hills and its location within the area of intense housing demand all justify its incorporation in the package.
The court does not deem its proximity to Interstate 287 to have a substantially depressing effect upon the likelihood of it being utilized for a planned unit development. There is, however, a significant condition relating to this property which will be addressed later. At this point, it should be repeated that the agreement of the township and EDC to expand the franchise area is contingent upon the willingness of AT & T to participate in the cost of expansion of the sewer service. That contingency is in the form of an option given to AT & T to participate in the franchise area. As will be noted, this site receives conditional approval in the sense that an alternate site will have to be provided if AT & T does not exercise its option in accordance with the agreement.

4. Site H  Leighton

Site H consists of approximately 13 1/2 acres. By the admission of the township expert, approximately eight acres are designated either as steep slopes or flood hazard lands. The town asserts that because of these constraints only 36 units could be built on the property of which seven could be low and moderate.
The court appointed master agreed with the conclusions of the municipality. In his report of April 11, 1984 he recommended *123 that this site be accepted as providing a realistic opportunity for the construction of lower income units subject to prompt and sustained efforts at expansion of the sewage treatment plant. In this case the master was referring to the BFH plant. The Public Advocate's expert discounted this site entirely because of its limited size. He felt it was not likely to develop within the compliance period. Dobbs' expert also contended that the scale of development of this site should remove it from Mount Laurel consideration.
While it is true that the site is zoned for planned residential development and may have the potential for higher density construction at some time in the future, it is very difficult for the court to say that there is a realistic likelihood that the site will be constructed within the compliance period. Over and above its physical constraints, the site must also await the technical upgrading of the BFH plant. While that seems likely within the compliance period, considering all other factors this is not a parcel which one would want to rely upon for the purposes of providing the realistic opportunity for the construction of Mount Laurel units.

5. Site I  Segerstrom

This parcel is approximately 25 acres only a half acre of which is designated as critical land. However, the tract consists of a large number of lots varying in size most of which are under diverse ownership. The township concedes that while it is zoned for multifamily development only a small portion of it is considered developable for the production of low and moderate income housing. Of the total acreage, the township argues that approximately 14 acres can be devoted to that purpose. The township stresses that three of the four lots comprising that 14 acres are more than three acres each. The multifamily district designation permits a density of 12 units per acre on any parcel of at least three acres. Therefore, theoretically any of the three lots consisting of at least three acres can be *124 developed individually without the necessity of the adjacent property owners selling to one another or developing in a joint venture. If the available land for compliance purposes is calculated, the township concludes that approximately 165 multifamily dwelling units could be constructed, 33 of which could be low and moderate income units.
The court-appointed master believed that it was not impossible that the three sites which had adequate zoning could develop independently. He stressed that assemblage would be preferable and that the necessity for assemblage made the overall parcel not nearly as attractive as other sites for the purposes of providing immediate availability. In a letter filed with the court, he questioned the likelihood that site I would become available in the absence of assurances that it would be marketed as an assembled site. He therefore did not credit this site towards the town's fair share obligation. The Public Advocate's expert concurred, reaching the conclusion that the assemblage problem required that this site not be credited for Mount Laurel compliance purposes. Dobbs' expert agreed.
In addition to the assemblage constraints, the site is also impeded by the unavailability of sewage treatment. It would have to depend on the expansion or technical upgrading of the BFH plant in order to be utilized for multifamily construction. While it is possible that some multifamily construction may take place on the lots located within site I at some time in the future and perhaps provide some of the lower income component which is deferred under this opinion to the 1991-1994 period, it cannot be said that in the context of requiring adequate zoning for 819 units, parcel I should be considered a compliance site. Therefore, the court agrees with the three experts who concluded that it should not be given any credit towards the fair share number.

6. Sites J and K  Timber Properties

Site J consists of approximately 23 1/2 acres. Site K consists of several lots totaling approximately 41.2 acres. All *125 of site J and a portion of site K is under option to Timber. Site J has extensive frontage on State Highway 206. It is located directly across from a major office research facility. The township alleges that this facility is the single largest land use within that portion of Bedminster and that it affects the character of the land uses surrounding that area. Site J is proposed to be included within an office research district. In accordance with the permitted development density of building floor area to land area, the parcel could accommodate a 179,000 square foot office research building. The township ordinance had provided for an intensity bonus increasing the floor area ratio from 0.175 to 0.220 which would allow a building with a total of 225,000 square feet. To obtain the intensity bonus the developer must dedicate to the township one acre of land within parcel K (under the same ownership as parcel J) for every additional 7,623 square feet added to the building to be constructed on parcel J. The intention is to use the dedicated land for construction of a senior citizen facility for lower income people. The township thought that the ordinance provision would generate a dedication of four to six acres of land.
During the course of the trial, the township and Timber reached a settlement concerning the zoning of this parcel. Timber agreed to take advantage of the floor area intensity bonus on the condition that the township increase the bonus so as to produce a commercial building of 260,000 square feet. In exchange Timber agreed to dedicate ten acres in parcel K. The balance of parcel K owned by Timber was to be developed through a single family cluster concept. The resulting project was to be provided with sewer capacity through the BFH plant and the township undertook to upgrade BFH as part of the settlement. Notwithstanding the increase in acreage dedicated, the township agreed that it would not seek credit for more than 90 Mount Laurel units.
The master concurred with the municipal zoning of the parcel even before the settlement took place. He agreed that 90 units should be credited to this site. The Public Advocate's expert, *126 who also testified before the settlement was reached, concluded that the floor area ratio bonus constituted a substantial incentive for the land dedication. He conceded that there was some difficulty in being sure that a nonprofit sponsor of a senior citizen housing project for the site would get funding. However, he characterized the possibility as "not negligible" and urged the court to give credit to the site because it was a serious proposal worth taking seriously and because of the benefits of 100% low and moderate housing which would result from it. He emphasized that it was important for the court to support alternative modes of compliance other than the provision of lower income housing through the construction of four market units in order to obtain one lower income unit. He did suggest that the court monitor the situation with regard to the progress of the nonprofit corporation in obtaining funding and that if, after a reasonable period of time, it appeared that funding was not likely or in fact had become more unlikely, the court require the township to do something to provide for the construction of those units or provide an alternative site.
Dobbs' expert, who also testified before the settlement was placed on the record, argued that this site should not receive any credit for Mount Laurel purposes. He first asserted that the absence of sewerage was a significant disincentive. Secondly, he did not believe that the increase in floor area ratio would act as an adequate incentive for the owner to exercise the option. He correctly pointed out that the ordinance did not require the lands to be donated specifically for lower income housing but rather for "public purposes".
The court concludes that this site should be given credit for 90 units of lower income housing based upon the agreement entered into between the township and Timber. It is evident that Timber has already perceived the incentive as being adequate to allow it to dedicate ten acres in site K. Apparently the sewerage issue, while by no means resolved, has taken a further step towards clarification since both the township and *127 Timber have a motive to pursue the technical upgrading of BFH. As will be seen later, the increase in capacity in BFH to provide for Timber can be accomplished without expansion of the plant but rather through technical improvement. Finally, while the availability of funding for the project may be problematic, the court finds the arguments of the Public Advocate's expert persuasive. Municipalities should be encouraged to satisfy their Mount Laurel obligation through means other than four to one construction. The court is willing to take a minimum risk, given the magnitude of the fair share of this township, to accomplish that goal. Additionally, by virtue of the conditions to be placed on this site, the risk can be further minimized. As will be seen later, the court will require a monitoring of the efforts being made to realize the construction of the 90 units. If after some reasonable time it appears that funding is not going to be acquired through outside sources, the township will have to consider undertaking the project itself through some other funding device or it will have to provide an alternate site.

7. Site M  Johnson

This parcel consists of approximately ten acres. It is zoned for a variety of residential and nonresidential uses. The township argues that it would be an excellent location for subsidized senior citizen housing and the compliance package provides the opportunity for that construction. However, the township seeks no credit towards its fair share number although it points out that the parcel could accommodate at least 90 lower income senior citizen units. It is offered as an alternate site to that parcel which has now been dedicated on site K. The master agreed that it was an appropriate alternative. The Public Advocate's expert, while agreeing that it is physically suitable, contended that it would be inappropriate to provide a fair share credit for more than one senior citizen project in the township since it was highly doubtful that the township could get funding for two projects in the period in *128 which the township is granted repose. Since the township does not rely on this parcel for satisfaction of its fair share, the court need not pass upon whether it is a realistic site.

8. Site L  Dobbs

This site was not included in the compliance package and, as a result, brought about the challenge by Dobbs. The entire parcel in which Dobbs has an interest consists of approximately 212 acres. The portion shown as parcel L on Appendix I comprises 137.5 acres. The township's expert calculated that through the use of the present single family cluster zoning, 108 dwelling units could be constructed on the noncritical areas of the property, none of which would be for lower income families. Dobbs has proposed several uses of the site. Initially, his intention was to develop a shopping center. Subsequently, in a letter dated February 7, 1984, he provided the court with three alternative uses. Dobbs' preferred alternative was a mixed commercial-residential use which would provide 250 lower income units. The other two alternatives were entirely residential and would produce from 192 to 232 lower income units depending upon the amount of acreage utilized. A portion of the parcel would be devoted to open space and another portion of it is deemed critical because it is within the flood plain.
The parties differ somewhat with respect to the accessibility of the site. The township contends that it has limited frontage on State Highways 202 and 206 and that access is encumbered by a 200 foot wide strip of Green Acre buffer easement extending along the entire easterly border of the property. Dobbs contends that the site which is just above Interstate 287 has direct access to the interstate and adequate access to Routes 202 and 206. Dobbs also contends that the buffer easement would not be a significant constraint on the property.
The major area of dispute is the feasibility of sewering the site. That issue led to extensive testimony concerning the overall impact of sewerage issues on the compliance package. *129 The Dobbs parcel is not located within the franchise area of EDC. It appears that it would be physically possible to provide the sewage treatment to the Dobbs site from EDC. Of course, if that were accomplished, EDC would have to reconsider its overall ability to provide capacity to other sites within the compliance package. Dobbs argues that if EDC cannot provide capacity he will provide his own sewage treatment facility on site. The system which he proposes, a rotating biological disc tertiary treatment plant with subsurface ground discharge, allegedly avoids the delay and problems involved with discharge into a waterway. Several days of testimony were consumed in evaluating the relative advantages and disadvantages of this method of treatment as compared to the point discharge method utilized by the EDC plant. That system releases its effluent directly into the Raritan River. The testimony also centered around the time span within which it would be possible to obtain approval and realize construction of the Dobbs plant as opposed to obtaining approval for the expansion of the EDC plant and its franchise area. Dobbs also asserted that it was possible to sewer his site through the BFH plant. Again BFH would require an upgrading in order to provide capacity and also would be giving preference to Dobbs over other sites within the compliance package.
The parties did not substantially disagree with respect to the time within which it would be possible to obtain approval for their sewerage programs. On balance, the court concludes that the most that can be said with any certainty is that it will take approximately two and one-half years to obtain all necessary approvals and complete construction of the Dobbs system and that it will take approximately the same period to expand the EDC plant. Dobbs' expert agreed that both systems are likely to come on line about the same time. It appears to the court that approval of the EDC plant is less uncertain than Dobbs' proposal given the status of EDC's present approvals and the fact that it was initially designed with the potential to double its capacity. While Dobbs contended that the Department of Environmental *130 Protection would require enlarged testing before EDC obtained approval for expansion, the testimony established that there is no reason why the application for expansion cannot run concurrently with the increased rate of testing as more units in the Hills development come on line. Technical upgrading of the BFH plant seems to be likely and perhaps the most expeditious means of providing additional capacity. However, the amount of capacity is rather limited and would be principally devoted to providing sewerage for the Timber sites (J and K).
The issue of whether a site may appropriately be included in the compliance package should not turn solely upon the question of its relative susceptibility to being sewered. Of course, if the proofs demonstrate that one site has very little likelihood of having the appropriate infrastructure provided to it and that another site is comparatively assured of having such facilities, those proofs cannot be overlooked. The evidence in this case does not support the conclusion that Dobbs is in any better position as it relates to sewer availability than any of the sites of the compliance package. In fact, the court must lean towards the conclusion that, as between the two plans, it is more likely the township plan will obtain approval and be implemented.
EDC is already committed to seeking an expansion and has started work towards that goal. The application for a discharge permit has already been filed. The original plant capacity can be doubled. It was also designed to the best available technological standards and those standards have not been altered to date. EDC is a functioning organization staffed by a competent director who testified in these proceedings. He appeared experienced in the process of obtaining governmental approvals and in the operation of the plant. The township has pledged its support for the expansion of both EDC and BFH. It has signed an agreement with EDC to cooperate in obtaining the necessary permits. It has also signed an agreement with *131 plaintiffs represented by the Public Advocate to take all necessary steps to have the BFH plant technically upgraded to increase its capacity by 50,000 gallons and thus make use of the Timber parcel more feasible. As part of its agreement with Timber, the township has agreed to reserve and allocate capacity in the BFH plant sufficient to accommodate effluent from the senior citizen development on site K. Overall the efforts of the town together with EDC have the potential of providing for almost an additional one million gallons of effluent for the compliance package.
One final aspect of the sewerage issue deserves only passing mention. Dobbs spent a substantial amount of trial time attempting to construct a hypothetical case which he labelled "The Hills Dilemma". Working from the assumption that all of the sites in the Pluckemin Village area were to be developed immediately, Dobbs aggregated the amount of sewage capacity needed in the EDC plant to service those sites, existing contractual commitments and proposed Hills construction in the adjacent Township of Bernards. This totaled approximately one and a half-million gallons. The present capacity of EDC is approximately 800,000 gallons. Thus, Dobbs argued that some projects either in Bedminster or Bernards would be delayed. There is no dilemma. In the first place, Dobbs does not account for the phasing which the court has authorized. Secondly, no one can expect that all of the sites will be built at once. In fact, that would be an undesirable result. Finally, no package can be devised in Bedminster which does not depend on sewer expansion or construction and the resulting delay. Even Dobbs would experience that delay.
Having considered each of the sites individually it is now necessary to address the compliance package of the township from the standpoint of an overall evaluation. Before doing so several caveats should be expressed. In the first place, it should be noted that we are in the infancy of the development of compliance packages throughout the State. Second, there *132 have been very few comprehensive reviews of compliance ordinances by our trial courts and as of yet no comprehensive published opinion with regard to any compliance ordinance. Third, it should be recognized that we are in an evolutionary process of developing alternative compliance mechanisms for Mount Laurel purposes. The literature concerning alternative methods of compliance is starting to develop. The court is receiving novel compliance ordinances taking varied approaches to providing lower income units. While we are in that process the court must be careful not to discourage efforts which could avoid the necessity to comply with Mount Laurel through the development of four market units for every lower income unit. Finally, the court must be mindful of the broad area of subjective judgment involved in determining whether a compliance package will accomplish its goal. For example, competent planners can disagree with respect to the likelihood of a given site being utilized for Mount Laurel purposes or a specific mechanism accomplishing Mount Laurel goals. The court is constantly faced with disputes over the judgments made by the municipality in its compliance efforts. It is imperative that the court not substitute its judgment concerning the reasonableness of the compliance ordinance for that of a well reasoned and soundly conceived municipal plan where more than one reasonable alternative exists. Just as a municipality is not required to do more than its fair share, (at 219) a municipality is not required to replace its reasonable approach with another reasonable approach merely because a property owner or owners, not entitled to a builder's remedy, are excluded from the package or because it might have been just as reasonable to include them. With these caveats in mind, the court must decide whether the Bedminster ordinance, in its totality, represents a reasonable approach to providing a realistic opportunity for lower income housing.
The township's approach to Mount Laurel compliance is to concentrate most high density housing in what is known as Pluckemin Village utilizing highways to create both a visual *133 and physical barrier between the high density areas and the remaining rural parts of the township. A secondary goal is to build up Bedminster Village as a small rural center in which the senior citizen housing is to be located. In addition, the township seeks to provide a limited infill development which will occur in Bedminster Village on sites H and I. To accomplish those goals the township has zoned sites A through G in Pluckemin Village and created a second node of development within the vicinity of Bedminster Village utilizing sites H through K. The vast majority of the fair share will occur within Pluckemin Village and it appears that all of the fair share compliance through 1990 is likely to occur in the Pluckemin Village sites and on site K. That latter site will provide only 90 units towards the fair share. The balance of the 656 units through 1990 will in all likelihood come from those sites located in Pluckemin Village. It is in that location that the present Mount Laurel development is underway.
Site A is already under construction and will provide 260 units. Site B shall be under construction shortly. Between those two sites the township will have already provided 440 of its 819 units within a very brief time. All of those sites are located to the east of Interstate 287 which creates what has been referred to by one expert witness as a "hard" barrier protecting and preserving the rural, residential and farm land to the west. The zoning eliminates the need to provide some transitional uses which would otherwise become necessary if the township were to allow development to the west of Interstate 287 in any substantial scale.
The township provides numerous additional justifications for the concentration of most of its compliance sites in one area. In the first place, it is obvious that Hills has tapped an intense housing demand and is likely to continue rapid construction. The development is likely to exert pressures upon adjacent properties making them attractive to potential developers. Furthermore, it is reasonable to assume that the change in the character of that immediate area might well have the effect of *134 motivating the existing land owners, even those with residences on the compliance parcels, to offer their properties for sale. The natural market forces would seem to favor the development of those sites which are concentrated close to the Hills sites rather than the development of sites scattered throughout the municipality. Furthermore, because of the corporate relationship, Hills has the benefit of controlling the EDC sewage treatment plant to provide capacity to both sites A and B. The township and EDC are now involved in a cooperative effort to provide capacity to the other sites in the immediate vicinity. Their proximity to the plant and their potential for Mount Laurel utilization gives credence to the fact that the expansion of the plant could be looked upon favorably by the supervising governmental agencies. There is no need for the construction of new facilities at EDC since the capacity can be provided through the expansion of an existing facility which is designed for the requisite amount of expansion needed to service all of the principal sites in the compliance package.
In terms of feasibility, that is whether the sites are zoned in such a manner as to permit Mount Laurel construction, there has not been a dispute among the parties. No one questions that the zoning is adequate. Finally, in terms of their availability to the market, the township expert has testified with respect to their potential for sale. While clearly there are no guarantees which could be implied from the statements made by the township expert, there seldom will be such guarantees. The best guarantee is the market itself which, in this case, argues strongly for the inference that these parcels will be offered for sale at some reasonable time in the future. No other hidden constraints surfaced during the 17 day hearing.
The issue of assurance that sites will be available for construction leads to the principal argument which Dobbs makes for inclusion in the Mount Laurel package. Essentially Dobbs presses upon the court the proposition that he is ready, willing and able to provide Mount Laurel housing on his site as soon as he can obtain sewer approvals. First, as previously set *135 forth, the test is not one of comparative likeliness. Second, even if it were, in the final analysis there is no greater guarantee of Mount Laurel housing emanating from Dobbs' site than all of the sites in the compliance package which the court is relying upon for satisfaction of the initial 656 units. Putting aside any argument that Dobbs is not a residential developer and is merely speculating with this site, the hard fact remains that no construction can take place on his site for a period of approximately two and one-half years assuming that approval of his sewer proposal is obtained. It must be remembered that the Dobbs application and the township application to expand EDC would be going forward at the same time. The regulatory authorities would then have to approve both sites for sewage disposal within the same repose period. However, if one assumes that approval can be obtained by Dobbs, construction will then commence within a time frame which is likely to result in units somewhere near the end of this decade. That time frame is not substantially different than the result anticipated from the utilization of the compliance sites of A through E. All experts who testified in this case conceded that fact and all but Dobbs' expert agreed that site K would be developed within the same period. Even Dobbs' expert placed sites A and B along with the Dobbs site in a category of parcels which would result in immediate construction. Under questioning he also conceded that sites C, D and E should be included in the compliance package. While Dobbs' expert did attach certain conditions to the inclusion of these sites those conditions are no less threatening to the realistic opportunity than is the uncertainty of sewerage approval for the Dobbs site and the delay which must occur even if approval is obtained.
As noted earlier the court has approved the deferral of 163 units of the township's fair share for the period from 1991 through 1994. It must be conceded that the other sites forming a part of the compliance package which are likely to come on line at a later date have a greater degree of uncertainty than those which will satisfy the obligation from 1985 through 1990. *136 It is for that reason that the court has imposed a condition concerning the utilization of those sites for Mount Laurel compliance purposes in the event that they are not developed prior to 1991. That condition will be discussed at greater length later in this opinion.
Thus, viewed in its totality, the court concludes that the compliance ordinance of the township provides a reasonable method of satisfying its fair share. It has eliminated all unnecessary cost generating devices, provided sufficient affirmative measures and enacted feasible zoning for sites which are likely to be available for satisfaction of that Mount Laurel obligation within the time established by the court. The exclusion of Dobbs from the compliance package is justified in light of the court's conclusion that the other sites are likely to provide Mount Laurel housing and because sound planning judgments underlie the development of the package.
Of course, the court could not reach this conclusion if Dobbs were entitled to a builder's remedy. As previously set forth, the test of compliance requires the court to ensure that the township recognize any established builder's remedies. Dobbs argues that he has earned a builder's remedy. He asserts entitlement to a remedy because he has actively participated in the compliance process after the case was remanded to this court in 1983, has introduced proposals that were incorporated into the final township compliance package and has provided the court with invaluable assistance in uncovering weaknesses in the township's package.
The court holds that Dobbs is not entitled to a builder's remedy. To fully understand the basis of Dobbs' claim and the court's denial of a remedy, it is necessary to repeat some facts that bear directly on that claim.
The first complaint in this action was filed in 1971. The litigation eventually led to an invalidation of the ordinance by the trial court in 1975 and an Appellate Division affirmance in 1977 requiring ordinance revision. A new ordinance was *137 adopted and again successfully challenged in 1979. The township did not appeal that decision. On January 29, 1980 the trial judge directed another revision process with the assistance of a master. On March 20, 1981 the trial court entered an order declaring the revised ordinance complaint with Mount Laurel I. The Public Advocate appealed on the grounds that this revised ordinance did not mandate lower income housing or a set-aside of lower income units. Before this appeal but during the new revision period, Dobbs filed a complaint on November 5, 1980 alleging that restrictive township zoning precluded him from constructing a regional shopping mall.
On August 2, 1983, the Appellate Division remanded the case to this court in light of Mount Laurel II. The court held its first case management conference on October 6, 1983. Dobbs appeared at this and subsequent conferences although his case was never consolidated. Because Dobbs' intentions concerning Mount Laurel construction remained unclear for months, the court required him to submit a written proposal summarizing his plans. By letter dated February 7, 1984 Dobbs presented three alternatives all of which contained some provision for lower income housing. As a result, over the township's objections, the court permitted him to continue informal participation in the revision process. During this involvement Dobbs submitted several reports to the master concerning such issues as sewerage, site suitability and affordability. Dobbs asserts that this input caused the township and master to abandon a December 1983 compliance proposal that was presented to the court. Dobbs contends that the proposal was inadequate in several respects and that it would have been accepted by the court but for Dobbs' invaluable aid.
At the compliance trial Dobbs produced several witnesses and again expended substantial efforts in attempting to demonstrate that the final compliance proposal did not pass muster. To Dobbs' credit, a few minor weaknesses were revealed and have become the subject of court imposed conditions on the compliance package. That is not to suggest that these technical *138 defects would not have been disclosed by the Public Advocate, the master or the court as the case proceeded. The real issue here, however, is whether Dobbs' undertaking entitles him to a builder's remedy. As noted, I hold that it does not.
First, Dobbs is not entitled to a builder's remedy because he has never been a Mount Laurel plaintiff and furthermore never participated in the portion of the trial invalidating the township ordinance. Mount Laurel II clearly enunciates a three-prong test that a plaintiff must satisfy to become entitled to a builder's remedy. (at 279-280) For purposes of Dobbs' claim, the court will focus upon the first prong  success in litigation. Quite simply, a plaintiff who has not succeeded in litigation, by demonstrating the invalidity of the township ordinance, cannot satisfy that first prong and therefore cannot become entitled to a builder's remedy.
The builder's remedy is a device that rewards a plaintiff seeking to construct lower income housing for success in bringing about ordinance compliance through litigation. The facts in this case demonstrate that Bedminster was brought to court and had its ordinance declared invalid long before Dobbs ever arrived on the scene. Thus, even if Dobbs were seeking to construct Mount Laurel units from the outset, he was simply too late to be entitled to a remedy. Therefore, Dobbs falls short on two grounds  he was neither a Mount Laurel plaintiff nor did he bring about the process leading to ordinance compliance.
Dobbs, nonetheless, relies upon his participation during the revision process and compliance hearing to assert that a grant of a builder's remedy is warranted. Dobbs essentially seeks to create a new category of builder's remedy which might be called the "but for bonus". He charges that but for his participation, the court would have approved an ordinance that was not compliant with Mount Laurel II. There is no direct authority for the proposition that a plaintiff may be entitled to *139 a builder's remedy merely because of active or even helpful participation in the revision process and compliance hearing.
The court is, of course, aware that the Supreme Court affirmed the grant of a builder's remedy to Davis Enterprises in Mount Laurel II despite the fact that Davis did not intervene until the remand following the Mount Laurel I decision. The Court itself recognized that Davis was not a typical plaintiff-developer since it did not institute the suit and that the primary reason for granting a builder's remedy, encouraging Mount Laurel suits, was not present. (at 309, n. 58) However, the Court noted that this deficiency was more than outweighed by the fact that Davis would provide a significant amount of actual lower income housing and the fact that after ten years of litigation and obstructionism on the part of Mount Laurel Township, it was important that something be built.
The unique circumstances in Mount Laurel Township compelled the Court to depart from its own guidelines in Mount Laurel II. That township had so flagrantly resisted the Mount Laurel I mandate and dug in its heels for a continued fight that it was imperative for the Court to do something more than again order rezoning. It seized upon the chance to achieve construction and timely implementation of the decision by taking advantage of a willing builder to deal with an unwilling town.
Dobbs' situation is clearly distinguishable. Bedminster, unlike Mount Laurel, has been attempting to comply since the denial of the township's petition for certification in 1977. The history of this litigation demonstrates that Bedminster promptly rezoned after that denial. It also chose not to appeal a second finding of invalidity in 1979 and instead proceeded towards complying with the Mount Laurel doctrine as it then existed. Additionally, unlike Mount Laurel Township, Bedminster has already permitted the construction of 260 lower income units which soon will be occupied. Bedminster has allowed the construction notwithstanding the fact that there has been no *140 final determination of the scope of its responsibility under Mount Laurel II.
Dobbs also relies upon Morris Cty. Fair Housing Council et al. v. Boonton Tp. et al., 197 N.J. Super. 359 (Law Div. 1984) which he contends stands for the proposition that a builder's remedy is appropriate where a developer has played a substantial part in bringing about Mount Laurel rezoning. In that case, Judge Skillman was faced with a party seeking to protect his claim to a builder's remedy within the context of the Public Advocate, another developer and the township seeking to exclude him as part of a "class action" settlement. The party being excluded was a Mount Laurel plaintiff from the outset who was prepared to participate in proof of noncompliance of the ordinance. Judge Skillman noted that the objecting party could seek to prove that his lawsuit played a substantial part in bringing the township into compliance. Id. at 373, n. 3. Nonetheless, on the facts before him, he denied a remedy to the objecting developer notwithstanding his Mount Laurel complaint and his full participation in the suit. Dobbs' circumstances are not analogous. He never brought a Mount Laurel action and additionally could not have played a substantial part in bringing about a rezoning process that had begun long before he ever became involved in this litigation.
Besides the absence of legal authority for Dobbs' claim, there is no sound policy argument supporting this new form of remedy. To the contrary, sound policy dictates that such a remedy not be recognized. If Dobbs were to prevail, then almost anyone who submitted reports to the master during the revision process, particularly if those reports were in any way useful, could claim entitlement to a builder's remedy. The "but for" claim would be echoed by anyone who saw the chance to ride the coattails of existing Mount Laurel litigation. The builder's remedy was never intended for such far-reaching use and possible abuse. Its purpose is to bring about Mount Laurel compliance by inducing and rewarding litigation which *141 starts the rezoning process. Once the process has begun, there is little need for further remedies. This court has recognized that, while builder's remedies have been the most effective device for bringing municipalities into compliance, there is a limit to the number of plaintiffs needed to vindicate the constitutional obligation and that excessive plaintiffs seeking builder's remedies can emasculate the municipal planning options. At some point, multiple builder's remedies are no longer necessary. J.W. Field Co., Inc. et al. v. Franklin Tp., 204 N.J. Super. at 454.
Dobbs posits that to deny his remedy would discourage the submission of valuable information and that it is unfair not to reward a litigant who is willing to incur the expense involved in that effort. The court does not believe that such data will be withheld nor does it believe that denying Dobbs a remedy is unfair. Dobbs did potentially have something to gain by participating in this litigation. While not able to assert a legal right to rezoning, Dobbs could hope to convince the township to voluntarily rezone his property for Mount Laurel purposes or convince the court that his site must be included in order to achieve a realistic opportunity to satisfy the fair share.
Something must be said about the factual validity of Dobbs' "but for" argument. Dobbs alleges, as noted, that were it not for his participation the township would have presented and the court would have approved a noncompliant ordinance. That is not correct. The court acknowledges that Dobbs did actively criticize some components of the compliance package-particularly sewerage. But Dobbs was not alone in such criticism. In December 1983, the township had presented a compliance package which the master generally endorsed. It was this court which rejected the proposal because it phased site availability based on sewer availability. The court acted even before Dobbs was heard to complain. It was the court which required that all sites be zoned at once and thereby placed the burden on the township to resolve the sewerage issue and to phase by a method other than site availability. For Dobbs to allege that *142 were it not for his criticism the court would have accepted the December 1983 package is both inaccurate and a bit presumptuous. The court recognizes that sewerage and water issues are paramount in most compliance packages and, with or without participants like Dobbs, the court has and will address them.
Finally, Dobbs' involvement in this suit is not the type of participation that the Supreme Court sought to encourage with a builder's remedy. The court does not suggest that Dobbs has used Mount Laurel in bad faith. However, it is clear that Dobbs did not become interested in Mount Laurel development until he realized that the township was unreceptive to his proposed regional shopping mall. He could reasonably assume that after the township had completed its Mount Laurel rezoning, his property could be subject to even less desirable zoning than when he began his suit. The war of attrition between Dobbs and the township was not one which Dobbs engaged in so that he could develop a substantial amount of low and moderate income units. It appears that the offer to construct lower income housing, even when it was ultimately elicited, was a required fall-back position from Dobbs' desire to build a shopping center. As a sophisticated land developer, Dobbs was doing everything he could to protect the substantial investment he had in the property and to come out of the fray with the best possible result. He cannot be faulted for that  nor should he be rewarded for his tenacity alone. A right to a builder's remedy should turn, whenever possible, on bright line legal principles not on a weighing of a myriad of equitable arguments which numerous litigants could cultivate through their participation.

C. Overzoning

In Mount Laurel II our Supreme Court said:
In some cases, a realistic opportunity to provide the municipality's fair share may require overzoning, i.e., zoning to allow more than the fair share if it is likely, as it usually is, that not all of the property made available for lower income housing will actually result in such housing. (at 270)
*143 The parties in this case disagree whether the compliance ordinance has provided for sufficient overzoning. The Public Advocate contends that for purposes of providing the initial 656 units, site G and either of the two sites zoned for senior citizen housing at 90 units each, can be viewed as the township's overzoning without giving any consideration to sites H, I and F. The township's position is that the utilization of sites A through E, which are conceded as realistic, provide 629 units which is 95% of the number of units which the court is requiring through 1990 and 76% of the fair share number of 819. The township asserts that given the rate of development and sale of residential housing in the Bedminster area coupled with the level of commercial and corporate development along the major highways in Somerset County, there is a very great likelihood that all of the sites will, in fact, be developed soon. Accordingly, it argues that the quantum of overzoning necessary to allow for the contingency that some sites will not be developed should be very low. The total number of units actually zoned for, by township calculations, is 900 or 137% of the 656 units required through 1990 and 110% of the fair share number. Dobbs contends that Bedminster has not adequately overzoned beyond its fair share number. He argues that adequate overzoning is that measure of zoning above the municipality's fair share which will reasonably assure that the municipality's constitutional obligation will be met in its entirety. With that assertion, Dobbs points to several sites involved in the proposed compliance package that are contingent upon factors such as the need for site assembly, the willingness of the owner to sell within the compliance period, the likelihood that a ready, willing and able developer will purchase and develop and the prevailing economic and marketplace conditions. Dobbs also contends that the unlikelihood of any site in Bedminster obtaining funding for any senior citizen construction would require that those sites be credited only towards overzoning.
Many of the uncertainties cited by Dobbs will exist in any large scale package. There are few guarantees in this process. *144 Even if the court were to grant Dobbs Mount Laurel relief, there is no absolute certainty that Dobbs would proceed with that construction. However, as has already been discussed, comparative likeliness is not the test.
Furthermore, any discussion of overzoning must now be viewed in the context of the phasing of the fair share obligation which the court has permitted and also in the context of the conditions which the court will impose upon the compliance package. The initial inquiry is whether there is adequate overzoning to satisfy the 656 units which must be constructed through the year 1990. As has already been reviewed, sites A through E provide the realistic opportunity for 629 units through 1990. By virtue of the agreement reached between the township and Timber, site K now has the realistic opportunity of producing an additional 90 units within that time span and thus a total of 719 units are clearly realistic by that date.
It should be noted that overzoning is not required in all instances and the degree of overzoning, when required, should be directly related to the likelihood of construction of those sites provided in the package. In this circumstance, the court believes that it has before it a greater assurance of compliance than is available in the typical case. In fact, it is a virtual certainty that 440 of the 656 lower income units will either be sold or under construction by the end of 1985. There is no other municipality before this court which could make the claim that approximately 70% of its fair share obligation through the year 1990 is almost secured. Given those set of circumstances and the fact that the court should not require such excessive overzoning as to subject the municipality to unnecessary growth, the court is satisfied that the overzoning for the initial phase of the fair share is entirely adequate.
With regard to the remaining 163 units of the total fair share obligation of 819 which must be constructed in the years 1991 through 1994, there is a more substantial argument that some doubt exists as to the feasibility of the sites necessary to *145 satisfy the fair share obligation. At this point, the argument is highly conjectural. Bedminster has zoned for its entire fair share and it may decide to permit construction of more units than are required by 1991. Those units would obviously be credited towards the second phase of its 1980-1990 obligation which need not be fulfilled until the end of the year 1994. For example, if sites A through E and site G are developed in the first compliance period, 719 units would be provided. If site K is also developed 90 units would be added for a total of 809 units still within the first compliance period. Therefore, the remaining obligation for the period of 1991 through 1994 would only be ten units.
Whether all of that construction will occur is unpredictable. In the court's view it is not now sound to require substantial overzoning for the second phase fair share obligation. Inasmuch as the repose given to the township will end approximately coincident with the termination of its first phase obligation and since a new fair share must then be assessed for it at that time for the decade of 1990-2000, it would be preferable to conduct a review of the status of Bedminister's compliance at that time. It can then be determined whether it is necessary to substitute sites for those which were deemed realistic for that period or to add additional sites to ensure that the second phase of the 1980-1990 obligation is met during the phased period of 1991 through 1994. It should be stressed that any obligation which exists during that period that has been carried over from the prior decade should be added on to the 1990-2000 decade and that rezoning to meet the fair share for that decade, if it occurs at the same time as the review for the prior decade, should include sufficient sites for both obligations.

D. Affordability of Lower Income Units

Dobbs has asserted that the units being constructed on site A by Hills do not meet the affordability criteria as established by the Court in Mount Laurel II or alternatively that if the units *146 do fall within the criteria they only provide housing at the outer limits of the low income and moderate income ranges. (cf. 221, n. 8) Dobbs concedes that the Bedminster ordinance requires that any lower income housing be offered for sale at a reasonable cross-section of affordability.
The testimony reveals that the homes being offered for sale in Hills' first development can be purchased by lower income families who will not be required to utilize more than 28% of their gross income to defray the cost of principal, interest, taxes, insurance and condominium fees. The testimony also reveals that those housing costs are normally utilized by the United States Department of Housing and Urban Renewal in calculating affordability and that that department utilizes a 28% standard for purchase of homes and a 30% standard for rental units. The 28% rule and the components of that 28% have become broadly accepted in Mount Laurel litigation.
Dobbs is correct in asserting that the homes in the first Hills development are only available at the upper ranges of low and moderate income. The actual prices were approved by the court within the unique context of this case in an effort to get some Mount Laurel housing underway. Furthermore, the court concluded that the availability of a home to a low income family of four at a purchase price of approximately $29,500 and to a moderate income family of four at a purchase price of approximately $48,500 represented a major breakthrough in the construction of lower income housing. The court evaluated the fact that the proposed selling prices did not create a substantial range of affordability in this single development. However, the overriding opportunity for actual construction of Mount Laurel dwellings, the voluntary compliance of the municipality in that effort and the fact that the failure to completely resolve the litigation was threatening the financing of the project compelled the court to grant approval in these limited circumstances notwithstanding the narrow range of affordability involved. Any future development must conform *147 to the express requirements of the Bedminster ordinance that a reasonable cross-section of affordability be provided. Given the fact that there will shortly be 260 lower income units constructed in Bedminster within a development which will include homes costing up to approximately $250,000, it is the court's judgment that insistence upon the technical requirement of a range of affordability at the time the court authorized construction of those units would have been totally inappropriate.

IV. Conditions of Approval

The compliance ordinance of the Township of Bedminster is approved subject to the following conditions:
1. The application for expansion of the EDC franchise area and expansion of the capacity of the EDC plant to accommodate 1.75 million gallons of sewage shall be pursued aggressively by EDC and the township.
2. The technical upgrading of the BFH plant to provide an additional 50,000 gallons of sewage capacity shall be pursued aggressively by the township.
3. The township shall file quarterly reports with the master regarding the status of the efforts to obtain approval for expansion of the EDC franchise area, expansion of its treatment capacity and the technical upgrading of the BFH plant. The master shall, in turn, file semi-annual reports with the court regarding the efforts being made and shall monitor to the extent necessary the progress of the applications. The master may also communicate with the court and parties on a more frequent basis if necessary and shall advise the court of any instance in which it appears that the applications are not moving forward either in good faith or in an expeditious manner.
4. The township shall take immediate steps to form a nonprofit senior citizen housing corporation which is necessary to fulfill the goals of constructing a senior citizen housing unit either on site K or M. The corporation shall be formed not *148 later than 90 days from the date of this opinion. Commencing six months from the date of this opinion, the nonprofit corporation shall file reports with the master as to the status of its efforts to obtain funding for and construction of a senior citizen housing project of not less than 90 units. The master shall report to the court on an annual basis as to the status of those efforts if he is satisfied that they are moving ahead actively and in good faith. He shall, of course, report sooner if it appears that sufficient efforts are not being made or that the likelihood of subsidization has become more remote. In the event that the nonprofit corporation has not obtained a funding commitment for the construction of the senior citizen housing units on or before December 31, 1987, the court shall consider requiring the township to provide alternative zoning or other mechanisms to substitute for the 90 units anticipated from the site unless it appears that a commitment for funding is likely to be obtained within a short period thereafter.
5. If by June 30, 1986, Timber or its successor has not actually dedicated the ten acre site in accordance with the agreement between Timber and the township, the township shall zone an alternate site with the same type of commercial incentive to create the opportunity for the dedication of lands for lower income housing purposes.
6. The present township ordinance requiring dedication of lands in exchange for an increased floor area ratio requires that those lands be available for "public purposes". That language does not ensure that the lands will be utilized for the construction of lower income housing. A condition of approval of the township ordinance is that it be amended to provide that the dedicated lands will be used for the construction of lower income housing. It need not specifically provide for lower income senior citizen housing.
7. The township shall adopt, if it has not already done so, a resolution authorizing EDC to expand its franchise area. As noted earlier, the township and EDC have already committed *149 themselves to expand the EDC franchise area to include the Mount Laurel sites in Pluckemin Village. As to site G, a notice shall be sent to the record owner advising that owner of EDC's intention to apply for an expansion permit to allow an increase in capacity of the plant and to include site G within the expanded franchise area. The notice shall inform the record owner that its property shall not be included within the area for which EDC shall make application unless that owner enters into an agreement with EDC within three months of the date of receipt of the notice concerning the payment of the cost of the owner's proportionate share of expansion of the plant and all costs incurred in bringing sewer service to that property. In the event that the owner of site G does not exercise its option to be included within the expanded franchise area and agree to the terms of its inclusion with EDC within that three month period, the township shall be required to provide an alternate site as part of its compliance package which will realistically produce at least 90 units of lower income housing. The township shall be required to notify the court at the conclusion of the three month period whether this condition has been satisfied. The Public Advocate and the master shall also monitor compliance with this condition.
8. By the admission of the township there is a defect in the land use ordinance which resulted from oversight and requires amendment. The ordinance gives residential and planned unit developers a commercial option. The exercise of the commercial option could reduce the overall number of lower income units which would be provided. The township has stipulated its intention to amend the ordinance to require a developer to provide lower income housing equal to 20% of the maximum residential units regardless of whether or not the commercial option is chosen. In this manner, the commercial option would not reduce the amount of lower income housing which the court has found can be realistically generated by those sites.
9. As noted in the discussion of overzoning, it will be necessary near the end of the repose period to review whether *150 additional sites must be zoned by the township to satisfy the second phase of its fair share obligation for the decade of 1980 to 1990. The township shall initiate proceedings before this court on or before January 1, 1990 to review that issue and the failure to do so may subject it to a builder's remedy with respect to any developer who institutes litigation after that date challenging the sufficiency of the zoning.
10. Finally, as has been noted earlier in this opinion, while the township has provided modest affirmative assistance in addition to mandatory set-asides in assisting Hills with respect to site A, approval of the compliance package should not be deemed as constituting a finding by this court that the township has done everything that it could have done in these circumstances or that it will not be required to do more in the future. As the Supreme Court said:
... Where appropriate, municipalities should provide a realistic opportunity for housing through other municipal action inextricably related to land use regulations. (at 264)
A township may not be passive in its approach to Mount Laurel compliance. It may not be enough merely to adopt land use regulations conforming to Mount Laurel II. However, at this posture it is not necessary for the court to define what a municipality may be legally or morally required to do beyond rezoning. Suffice it to say that it is legally required to take whatever additional action is necessary to satisfy its constitutional obligation. While Bedminster receives legal repose from suit it may not rest in its efforts to bring Mount Laurel housing to fruition. It has shown a willingness to achieve actual construction but it may have to do even more to complete the task.
*151 

*152 APPENDIX II

 Sites A B C D E F G H I J-K TOTAL
 Coppola 260 180 34 35 120 51 90 7 33 90 900
 Mallach 260 180 34 35 120 31 90 0 0 90 840
 Raymond 260 180 34 35 120 51 90 7 0 90 867
 Wallace 260 180 34 35 120 0 0 0 0 0 629